# EXHIBIT A

**ADMINISTRATIVE SERVICES AND PROFESSIONAL STAFF AGREEMENT**

**BETWEEN**

**RESTORIX HEALTH, INC.**

**AND**

**SALEM COUNTY HOSPITAL CORPORATION dba SALEM MEDICAL CENTER**

**DATED**

**MARCH 1, 2019**

## ADMINISTRATIVE SERVICES AND PROFESSIONAL STAFF AGREEMENT

**WHEREAS**, RESTORIX HEALTH, INC. (**"Operator"**) is in the business of providing equipment, administrative services and certain professional staff to, or on behalf of, health care providers that furnish wound care and hyperbaric oxygen therapy; and

**WHEREAS**, SALEM COUNTY HOSPITAL CORPORATION D/B/A SALEM MEDICAL CENTER ("Hospital") will operate a hospital at 310 Woodstown Road, Salem, NJ 08079; and

**WHEREAS**, Hospital and Operator desire to enter into an agreement effective as of March 1, 2019 (the "**Effective Date**") whereby Operator will facilitate operation and maintenance of a comprehensive wound care facility at, or under the auspices of, the Hospital and will assist the Salem Hospital with billing and collection services relating to services provided at such facility, pursuant to the terms and conditions set forth below.

**NOW**, **THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, Hospital and Operator agree as follows:

1.   **DEFINITIONS**

   **1.1.**   **Certain Defined Terms**.   As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

   "**ACH Transfer**" means the transfer of funds electronically through the Automated Clearing House or through such other electronic payment network reasonably acceptable to Operator.

   "**Accrediting Organization"** means the Joint Commission or other accrediting organization of Hospital or the CWC Facility.

   "**Administrative Services**" means the registration of Patients directly in the Hospital's computer system, the implementation of processes to assist Hospital in monitoring compliance with Hospital's policies, the validation and verification of insurance coverage and the performance of administrative services needed in order to bill the Responsible Parties for Treatments administered at the CWC Facility, and the procurement of any Staff at the CWC Facility.

   "**Administrative Staff**" means those non-professional individuals employed by Operator to render CWC Administrative Services pursuant to the terms of this Agreement.

   "**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.   For purposes of this definition, "control" means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management policies of such Person, whether through ownership of voting securities, by contract or otherwise.

   "**Agreement**" means this Administrative Services and Professional Staff Agreement (including the Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

   "**Awareness Program**" – Section 8.2.

   "**Billing Protocol**" means the procedures set forth on Exhibit D and such other procedures established by Operator from time to time, subject to Hospital's consent, which consent will not be unreasonably withheld.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the state in which Hospital is located.

"**Chamber**" – means one (1) monoplace hyperbaric oxygen chamber.

"**Code**" – Section 4.1.

"**Confidential Information**" – Section 11.2.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, in each case required to permit the consummation of this Agreement.

"**Construction Bid**" means a binding offer or bid from a licensed contractor(s) to construct the CWC Facility in accordance with the Final Construction Plans for a guaranteed fixed price and containing such other terms and conditions as are customary for such an offer.

"**Construction Costs**" means all of the costs of constructing the CWC Facility at the Designated Location in accordance with the Final Construction Plans and such additional costs, if any, reasonably necessary to obtain any construction, building, occupancy or other similar permits relating to the CWC Facility.   "Construction Costs" shall include (a) the Construction Plans, (b) all compensation payable to contractors and subcontractors, (c) all costs related to supplying the CWC Facility with adequate medical gas, oxygen, air conditioning, heating, plumbing and electrical systems, (d) costs of any asbestos abatement, (e) costs for all building materials and (f) costs for removing and replacing any Romex wiring or any air handlers; but shall <u>not</u> include the cost of any CWC Equipment, CWC furniture (including Wound Care Furniture), CWC fixtures and CWC property; and (h) any fees or costs related to the interior design or decoration of the CWC Facility.

"**Construction Plans**" means the architectural, design and engineering plans for the construction of the CWC Facility and leasehold improvements at the Designated Location.

"**CWC Equipment**" means HBO Equipment and Wound Care Furniture, collectively.

"**CWC Facility**" means a comprehensive wound care facility for providing Patients with HBO Treatment and Wound Care Treatment and shall consist of a minimum of one (1) Chamber and ancillary equipment sufficient to treat one person at a time.

"**CWC Administrative Services**" means: (i) installation of CWC Equipment at the Designated Location and the maintenance thereof; (ii) providing the Administrative Staff and certain Professional Staff necessary for the operation of the CWC Facility in accordance with professional, generally-accepted operating standards in the wound care and hyperbaric oxygen therapy treatment industry; and (iii) Administrative Services.  Notwithstanding anything contained herein to the contrary, CWC Administrative Services shall not include Professional Services.

"**Default Rate**" means the lesser of (a) twelve (12%) percent per annum; and (b) the maximum legal rate of interest chargeable by Operator.

"**Designated Location**" means the space at the Hospital where the CWC Facility will be located as shown on Exhibit A, or such other space as the Parties may otherwise agree in writing.

"**Dive**" means the administering of an HBO Treatment to a Patient in a Chamber.

"**EMR**" means Electronic Medical Records.

"**Exhibit**" means any of the addenda, schedules, lists or documents appended to this Agreement after the Parties' signatures and identified as such.

"**Extension Term**" – Section 10.1.

"**Final Construction Plans**" means Construction Plans which the Parties have jointly approved.

"**First Service Date**" means the date on which the first Treatment is administered to a Patient at the CWC Facility.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**HBO Equipment**" means the equipment and furniture (including chairs and tables) installed in the CWC Facility from time to time which Operator deems necessary and appropriate to deliver HBO Treatments to Patients.

"**HBO Treatment**" means all of the Professional Services and Administrative Services incident to providing a Patient with hyperbaric oxygen therapy treatment.

"**Hospital**" – Recitals.

"**Initial Term**" – Section 10.1.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**License**" – Section 2.1.

"**Losses**" – Section 12.3(A).

"**Operating Day**" means any day on which both (a) the CWC Facility is open to treat Patients; and (b) the CWC Equipment is functional.

"**Operator**" – Recitals.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or bylaws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Parties**" means Hospital and Operator, collectively.

"**Party**" means Hospital or Operator.

"**Patient**" means the individual receiving Treatments at the CWC Facility.

"**Payment Schedule**" means the Schedule annexed hereto as Exhibit C that sets forth the Service Fee payable by Hospital to Operator per Treatment.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Plan of Care**" means the plan of care established by the physician responsible for the Patient's Treatments, in accordance with Hospital policies, which plan shall not be altered in type, scope, frequency, or duration by the Staff (in the case of an adverse reaction to a specific treatment creating a Patient emergency, the emergency procedures of Hospital shall be followed).

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority.

"**Professional Services**" means those services (including Treatments) to be provided to a Patient as authorized and set forth in the Patient's Plan of Care.  Professional Services shall be rendered in accordance with professional standards, and in accordance with the Plan of Care established by the Treating Physician or other qualified therapists as provided by law to develop a Plan of Care. Professional Services shall only be provided by Physicians and licensed individuals in accordance with local, state and federal laws, rules and regulations.

"**Professional Staff**" means those individuals who can lawfully provide Professional Services.

"**Programs**" – Section 4.2.

"**Responsible Parties**" means a Patient and any other Person which insures the payment, or is otherwise financially obligated to pay, for medical services (including Treatments) provided to such Patient.

"**Service Fee**" – Section 3.1.

"**Staff**" means Administrative Staff and certain Professional Staff, collectively, as listed on Schedule 4.1 attached hereto.

"**Term**" means the Initial Term and any Extension Terms.

"**Termination Date**" means the day on which this Agreement expires or otherwise terminates or is effectively terminated pursuant to Article 10 hereof and is not necessarily the day on which notice of termination of this Agreement is given.

"**Treating Physician**" means the physician who performs the Treatments at the CWC Facility and is responsible to the Patient.

"**Treatments**" means HBO Treatment and Wound Care Treatment, collectively.  Each day's Treatment (whether it is HBO Treatment or Wound Care Treatment) shall commence when a Patient signs into the patient log maintained by the Staff at the CWC Facility and shall conclude when the Patient has received HBO Treatment or Wound Care Treatment consistent with such Patient's Plan of Care.

"**Workplan**" – Section 5.5.

"**Wound Care Furniture**" means the furniture (including chairs and tables) installed in the CWC Facility from time to time which Operator deems necessary and appropriate to deliver Wound Care Treatments to Patients.

"**Wound Care Treatment**" means all of the technical and non-technical services incident to providing treatment and care (other than HBO Treatment) for any wound.

**1.2.**   **Other Interpretive Provisions**.   The words "**hereof**", "**herein**" and "**hereunder**" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Exhibits hereto) and not to any particular provision of this Agreement, and all Article, Section and Exhibit references are to this Agreement unless otherwise specified. The words "**include**", "**includes**" and "**including**" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the

context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America.

## 2.   CWC FACILITY

**2.1.**   **Grant of License**.   Hospital hereby grants to Operator a license to enter Hospital and occupy the Designated Location for the purpose of performing Operator's obligations under this Agreement, including but not limited to the CWC Administrative Services (the "**License**"), with each such service performed in accordance with the terms of this Agreement.   The License shall terminate automatically on the Termination Date.   Hospital shall not be required to take any action to terminate the License or to notify Operator that the License has been terminated.

**2.2.**   **Designated Location**.   If the Designated Location is not identified on Exhibit A hereto, within thirty (30) days of the date of this Agreement, Hospital and Operator shall agree on the space that will be the Designated Location.   If the Parties are unable to agree on the Designated Location within thirty (30) days of the date of this Agreement, either Party shall be entitled to terminate this Agreement, upon five (5) days written notice to the other Party.   If this Agreement is terminated pursuant to this Section 2.2, neither Party shall be entitled to recover any costs or damages from the other Party.

**2.3.**   **Development and Design**.   Hospital shall hire, and shall be responsible for compensating, architectural and engineering design professionals to develop and create the Construction Plans.   Such professionals shall take direction from, and shall report to, Hospital.   The Parties shall meet regularly to discuss and work diligently in good faith to reach agreement regarding the Construction Plans.   Once the Parties have jointly agreed in writing upon the Final Construction Plans, Hospital, together with such architectural or engineering professionals as Hospital shall determine in consultation with Operator, shall submit the Final Construction Plans for such Governmental Approvals as shall be necessary.

**2.4.**   **Construction**.   Consistent with the Final Construction Plans, Hospital, its sole cost and expense, shall construct, or shall cause to be constructed, the CWC Facility at the Designated Location. Hospital shall be obligated to pay all Construction Costs.

**2.5.**   **Installation of HBO Equipment**.   Operator agrees to install, at its sole cost and expense, at the Designated Location, that HBO Equipment necessary for the operation of the CWC Facility as set forth in Exhibit B attached hereto.   Operator shall not be obligated to engage an interior designer, decorator or any other similar professional.   Operator will try to match finishes (including paint color and wallpaper) to existing finishes whenever reasonably possible.

**2.6.**   **Furniture**.   At its sole cost and expense, Operator shall provide the CWC Facility with all furniture.   Operator shall furnish the CWC Facility in consultation with Hospital.

**2.7.**   **Target Date for Opening**.   Operator and Hospital agree to use commercially reasonable efforts to cause the CWC Facility to be open to receive Patients within one hundred and twenty (120) days after the later to occur of (a) the Effective Date of this Agreement, and (b) receipt of all Governmental Approvals for the Final Construction Plans.

**2.8.**   **Maintenance of HBO Equipment**.   Operator, at its sole cost and expense, shall keep the HBO Equipment in good condition and working order consistent with all manufacturer specifications. Operator shall promptly install any and all manufacturer recommended upgrades to the HBO Equipment. Operator will keep all maintenance agreements in effect during the Term hereof to ensure necessary preventative maintenance and timely repairs.

**2.9.**   **Adding or Subtracting HBO Equipment**.   Operator, at its sole cost and expense, may increase the number of Chambers and install additional ancillary equipment as demand for HBO Treatments at the CWC Facility increases, as determined by Operator, in consultation with Hospital. Within thirty (30) days after the end of any rolling six (6) month period ending on or after the one (1) year

anniversary of the First Service Date, in which the CWC Facility averaged less than four (4) Dives per Operating Day, Operator, at its sole cost and expense, may, with Hospital's approval (which shall not be unreasonably withheld), remove one of the Chambers at the CWC Facility; provided, however, that such right cannot be exercised more than once in any six (6) month period and provided, further, that unless this Agreement is terminated pursuant to Article 10, Operator shall not remove all Chambers from the CWC Facility.

      **2.10.**   **Exclusive Arrangement**.  During the term of this Agreement, Hospital agrees that Operator shall be the sole and exclusive provider of CWC Administrative Services at Hospital and that Hospital shall not enter into any agreement for the provision of the CWC Administrative Services, the provision of non-medical management and administrative services incident to HBO Treatments or HBO Equipment or the provision of similar equipment or medical devices with any Person other than Operator without Operator's express written consent therefor.

**3.**      **COMPENSATION TO OPERATOR**

      **3.1.**   **Amount**.  Except as provided in Sections 3.4, 3.5 and  3.6, for and in consideration for all CWC Administrative Services rendered by Operator pursuant to this Agreement, Hospital shall pay Operator a fee equal to a percentage of those amounts collected by Hospital for Treatments administered to Patients at the CWC Facility as set forth in Exhibit C attached hereto (collectively, including the amounts, if any, owed under Sections 3.4, 3.5 and 3.6, the "**Service Fees**").  The Service Fees shall be inclusive of any and all applicable taxes.

      **3.2.**   **Payment of Service Fees**.  All Service Fees during a particular month shall be due and payable on the thirtieth (30th) day following the end of such month.  Hospital shall remit payment to Operator of all Service Fees on or before their respective due dates by ACH Transfer.  Hospital shall make payment to Operator of all Service Fees and all other amounts invoiced on or before their respective due dates.  Any amounts not paid when due shall accrue simple interest at the Default Rate from the due date until paid in full.  Contemporaneously with each ACH Transfer to Operator, Hospital shall send an e-mail to Operator (addressed to Operator at invoicing@restorixhealth.com or to such other address as Operator may designate to Hospital in writing) which shall confirm the details supporting the payment by ACH Transfer, which confirmation shall contain that information substantially similar to that supporting the issuance of an ordinary business check.

      **3.3.**   **No HBO Treatments to Inpatients**.  No Hospital inpatients shall receive HBO Treatments at the CWC Facility unless otherwise agreed by the Parties, which consent will not be unreasonably withheld.

      **3.4**   **Hospital Employees Receiving Treatment**.  Operator acknowledges that from time to time, Hospital employees may become patients of the CWC Facility.  In such an event, Hospital agrees to bill the applicable insurance carrier and pay Operator in accordance with the terms of the Agreement.  In the event that Hospital elects not to bill the insurance carrier, Hospital agrees to pay Operator fifty percent (50%) of the then prevailing Medicare reimbursement rate for such Treatment rendered.

      **3.5**   **Charitable Treatment of Patients**.  Operator acknowledges that from time-to-time, Hospital may require that Treatment be rendered to Patients without payment to Hospital, due to Hospital's charitable care policies.  Operator shall be bound by Hospital's determination of charitable need in all such instances.   Notwithstanding any provision of this Agreement to the contrary, Hospital shall pay to Operator a fee equal to: (a) in the case of HBO Treatments, fifty percent (50%), and (b) in the case of Wound Care Treatments, fifty percent (50%), of the then prevailing Medicare reimbursement rate for such Treatment rendered to a Patient at the CWC Facility when such Patient is not obligated to pay Hospital for such Treatment.  Any amounts owed by Hospital to Operator under this Section 3.5 shall be billable as early as the end of the month in which such Treatment is rendered and shall be included in a separately billed invoice rendered by Operator to Hospital as provided in Section 3.2, and shall be paid by Hospital as provided therein.

**3.6** **Hospital Capitation Contracts**.  If Hospital is a party to or enters into any capitation agreement with a payor source whereby Hospital is paid per patient on a monthly basis, Hospital shall pay Operator fifty percent (50%) of the prevailing Medicare rate for the applicable Treatment for each capitated Patient receiving Treatment at the CWC Facility.

**3.7** **E&M Codes**.  Where permissible, Hospital shall bill E&M Codes to related third party payors.

**3.8** **Adjustments**.  All payments made by Hospital to Operator are provisional in nature and remain subject to adjustment on future invoices should either Party discover that a calculation error has been made or any payment received by Hospital from a Responsible Party is reversed or adjusted, in whole or in part.

**3.9** **Billing Cooperation**.  Subject to Section 5.1, Hospital and Operator agree to provide each other with reasonable access to Patient information and books and records necessary for Hospital and Operator to effectuate the billings and collections for Treatments and for Operator and or Hospital to verify same, as well as such information of Operator which may be required by Hospital to prepare its cost reports.  Notwithstanding anything herein to the contrary, any disclosure of such Patient information, books, or records shall be subject to the confidentiality requirements and limitations set forth in Sections 11.1, 11.2 and 11.4 of this Agreement as well as the requirements of all applicable Laws regarding disclosure of patient information.  Hospital and its agents shall have access to and the right to audit all of Operator's records and other information to determine whether Operator and its agents have fulfilled their obligations under this Agreement, including but not limited to the accuracy of information relating to billings and collections.

**3.10** **Survival**.  Each of the Sections of Article 3 shall survive the termination or expiration of this Agreement.

**4.** **ADDITIONAL RESPONSIBILITIES OF OPERATOR**

**4.1** **Staff**.  Operator shall supply all Staff necessary to operate the CWC Facility, as Operator shall reasonably determine.  Operator shall be responsible for all salary and related expenses for the Staff listed in Schedule 4.1 attached hereto.  Prior to the assignment of each Staff member to the CWC Facility, Operator shall perform a comprehensive background check on each Staff member. Operator further agrees to cause each Staff member to comply with the health assessment provisions of the Code of the Health Department of the state where the CWC Facility is located (the "**Code**").  Operator agrees to require every Staff member to comply with the Code by receiving required health assessments through Hospital's employee health services.  The Staff will be bound by all of Hospital's policies and procedures.

Should the Hospital have any concerns regarding the performance of any Staff, the Hospital shall meet with the supervisor of said Staff to discuss the concerns.  In the event the Staff's performance does not conform to the Hospital's expectations within thirty (30) days after the meeting, then Hospital may request in writing that Operator to remove such Staff on an immediate basis and replace him/her with a new Operator employee (a "**Removal Request**").  Upon receipt of a Removal Request, Operator will immediately remove such Staff member and will use best efforts to provide (full or part time interim coverage) and replace said employee in a reasonably prompt manner.  Notwithstanding anything herein to the contrary, Hospital shall have the right to require Operator to immediately terminate a Staff member for any of the following reasons (an "**Event of Immediate Termination**"):  the conviction of a Staff member on any felony charge by any federal or state authority or any charge related to the provision of healthcare services; the exclusion of a Staff member from participation in any federal or state health care program; a violation by a Staff member of Hospital's corporate compliance plan, as determined in Hospital's sole opinion; or if, in Hospital's sole opinion, such termination is reasonably necessary to secure the health, safety or welfare of Hospital patients, employees, staff, volunteers, or visitors and the smooth operation of the Hospital. Operator agrees to immediately notify Hospital if Operator becomes aware, in connection with any Staff members, of any reasons that would give rise to an Event of Immediate Termination. Upon receipt of written notice from the Hospital of an Event of Immediate Termination, Operator will immediately terminate such Staff member and will use best efforts to provide

(full or part time interim coverage) and replace said Staff member in a reasonably prompt manner.  In the event the Staff member must be removed, then the Parties will cooperate in coordinating the removal so as ensure compliance with all applicable laws and to minimize the risk of potential litigation.  Under no circumstances shall any request(s) by Hospital for the Operator to remove any Staff member (immediately or otherwise) be based on any discriminatory factor which violates any law, rule or regulation, such as race, color, religion, national origin, disability, age, sex, marital status or military veteran's status.  In the event of a resignation or termination, Operator shall take reasonable steps to secure temporary support and a full-time replacement.

       **4.2**     **Qualifications**.  At Hospital's request, Operator shall assist Hospital in establishing minimum requirements and training courses (collectively, the "**Programs**") to help Hospital ensure that only qualified personnel will be used in connection with the provision of the CWC Administrative Services and Professional Services.  Operator shall provide training on an "as needed" basis as reasonably requested by Hospital from time to time to Staff, including but not limited to training in the areas of HIPAA, Code of Conduct and sexual harassment.  Operator's training obligations under this Section 4.2 shall exclude any educational or other programs or courses provided by a third party unless any and all of the fees and/or costs incident to such programs or courses (including tuition, travel, meals and lodging) are borne by Hospital or the Staff member receiving such training.

       **4.3**     **Credentials**.  Operator shall assist Hospital in performing quality reviews to help Hospital ensure all Staff possess the licenses, certificates and credentials required by the applicable Government Authority and Hospital's by-laws.

       **4.4**     **Standard of Performance**.  Operator shall assist Hospital in performing quality and competency reviews to ensure that all Staff members perform the CWC Administrative Services hereunder only upon the properly executed orders and subject to the supervision of the Treating Physician, and in accordance with proper procedures.  Operator shall take reasonable steps to assist Hospital in ensuring that all Staff members (a) act in good faith and with due diligence; (b) perform Treatments in accordance with recognized standards of the medical profession; (c) comply with Laws and standards of Accrediting Organizations applicable to the services being rendered by the Staff; and (d) comply with all Hospital by-laws, rules, regulations and policies.  In addition, Operator shall assist Hospital in monitoring the Treatment rendered at the CWC Facility, report any Treatment information and data required for Hospital to administer its compliance program and consult with Hospital regarding performance improvement measures for the CWC Facility.

       **4.5**     **Policies**.  Operator shall assist Hospital, as may be reasonably requested by Hospital, in developing appropriate policies, procedures and protocols for the provision of the CWC Administrative Services.

       **4.6**     **Working Hours**.  The hours that the CWC Facility shall operate shall be set by Hospital after consultation with Operator and shall be subject to change by Hospital based upon program utilization and upon reasonable notice to Operator.

       **4.7**     **Consultation**.  As may reasonably be requested by Hospital, Operator will provide hyperbaric consulting services to Hospital at no additional cost to Hospital.

       **4.8**     **Operator Employees**.  Operator shall be responsible for income tax, unemployment insurance, social security, or any other withholding or other employee benefits as is required by Law for the individuals employed by Operator.  Operator agrees that it shall instruct its employees that they shall not represent themselves as Hospital employees, and shall take reasonable steps to ensure that such instructions are obeyed by its employees.

       **4.9**     **Preauthorization of Patients**.  During the term of this Agreement, at the sole cost and expense of Operator, Operator shall be responsible for obtaining preauthorization of Patients with all forms of insurance or with no insurance, inclusive of Medicaid and Medicare in a manner acceptable to Hospital.

**4.10**   **Billing and Collection**.  As more particularly set forth in Section 5.1, Hospital shall have the exclusive right and responsibility to bill and collect for all Treatments.  Notwithstanding the foregoing, Operator shall be responsible for monitoring the Hospital's billing process with respect to Treatments and shall, at Hospital's request, act as agent for Hospital, in order to assist in collecting payment from all third-party insurance payers for Treatments; provided, however, that notwithstanding the foregoing, nothing herein shall require Operator to commence litigation to collect such payments or otherwise incur costs to any third parties.

**4.11**   **Billing and Coding Education and Training**.  Operator shall assist Hospital in providing educational services and training of personnel designated by Hospital to assist with the implementation of appropriate coding, insurance pre-authorization, and billing procedures, and in the review of such procedures.  Operator shall also assist Hospital and physicians with the establishment of medical records, charting and documentation.  All Operator training and assistance will be in compliance with all applicable Laws including all laws, rules, and regulations pertaining to proper Medicare billing compliance (including all National and Local Coverage Determinations), Medicaid billing compliance, the Anti-kickback statute, the Civil False Claims Act, and applicable third party payer contracts or billing principles.  Operator shall cooperate with and assist Hospital in its collection from third party payers of delinquent or denied accounts, and shall further assist Hospital to file appeals on claims or resolve other billing disputes with respect to program services.  Notwithstanding any language in this Section to the contrary, under no circumstances shall Operator be responsible for any medical malpractice claims, liabilities, damages, or penalties relating to medical record keeping, charting or documentation generated solely by Hospital staff or its physicians.

**4.12**   **Quality and Standard of Performance Measures**.  As of the Effective Date, the Parties shall discuss and use best efforts to agree on quality and standard of performance measures for the CWC Facility, for the following year from the Effective Date, as ultimately determined in the Hospital's sole discretion.  The quality and standard of performance measures shall be measured quarterly starting with the period commencing on the Effective Date.  The quality and standard of performance measures shall be reviewed by the Parties in good faith and shall be reasonably adjusted on an annual basis, if necessary, as determined in the Hospital's sole discretion.  The quality and standard of performance measures shall be measured quarterly starting with the period commencing on the Effective Date and shall consist of the following metrics.

      **A.**   Patient Satisfaction – 95%.

      **B.**   Healing Percentage – 88%.

      **C.**   Median Days to Heal – 36 days.

**4.13**   **Medical Director**.  Operator shall identify and contract with a physician to serve as the Medical Director of the CWC Facility, subject to the initial and continuing approval by Hospital.  The Medical Director shall be responsible for providing certain administrative services to the CWC Facility. Operator shall ensure that the Medical Director documents all time spent performing services under the terms of a separate Medical Director Agreement.  Any agreement for medical director services shall conform to applicable legal requirements.  Operator agrees that the compensation paid to the Medical Director shall (i) be fair market value for services rendered; (ii) not take into account the value or volume of referrals by the Medical Director to the CWC Facility and (iii) be commercially reasonable.  In addition, the arrangement between the Operator and the Medical Director shall otherwise fully comply with applicable law including, without limitation, compliance with a Stark Exception and a safe harbor under the Anti-Kickback Statue. Finally, upon request, Operator will provide Hospital with a copy of any and all agreements for Medical Director services. The maximum compensation for the Medical Director shall be set forth in Schedule 4.1, attached hereto and incorporated herein by reference.

**5.**   **ADDITIONAL RESPONSIBILITIES OF HOSPITAL**

**5.1.**   **Billing and Collection**.  Hospital shall register all Patients and bill all Treatments under its provider number in accordance with other hospital-based services.  Hospital shall use commercially

reasonable efforts to collect all amounts due from any Responsible Party for Treatments rendered at the CWC Facility.  Hospital shall consult with Operator before Hospital releases any Responsible Party from its obligation to pay for such Treatments.  When appropriate under the circumstances, Hospital shall promptly notify Operator of a request received by Hospital for documentation, denials, ADRs or pre or post-payment audits relating to any Treatments rendered at the CWC Facility and, in such circumstances, the Hospital shall use commercially reasonable efforts to coordinate with Operator the formulation and delivery of Hospital's response to any such request.  Notwithstanding any provision of this Agreement to the contrary, Hospital's failure to timely perform its obligations under the previous sentence with respect to a particular request shall relieve Operator, to the extent that Operator is not contributorily responsible, from responsibility for (and Hospital shall indemnify Operator against any liability resulting from) any penalties or similar charges incurred or assessed against Hospital and/or Operator relating to Hospital's failure to timely, accurately or adequately respond to such request.  This Section shall survive the expiration or termination of this Agreement.

**5.2.**   **Medical Supplies and Cleaning**.  At its sole cost and expense, Hospital shall provide the CWC Facility with janitorial, maintenance and security services (including door lock schedule including cores and installation) and medical supplies necessary to provide Treatments at the CWC Facility.

**5.3.**   **Linen and Gown Supply**.  At its sole cost and expense, Hospital shall supply and clean all linens and gowns required in connection with Treatments provided at the CWC Facility.  Linens and gowns shall be of a quality substantially similar to the quality of linen and gowns generally utilized by Hospital.

**5.4.**   **Telecommunications, Utility Services, Computers and Office Supplies**.

**A.**   At its sole cost and expense, Hospital shall provide the CWC Facility with utilities, lighting, electrical current and outlets, normal hospital heating, ventilation and air conditioning, access to restrooms, telephones and telephone and facsimile service (including fax lines), broadband Internet and cable television access and general office supplies.

**B.**  Operator shall supply Hospital with a list of personal computers, scanner, printers and copying equipment (the "**IT Equipment**") needed to operate the CWC Facility.  Hospital shall purchase, install and service the IT Equipment, and also provide:

(a) network cabling and jacks for desktop personal computers and wireless network connections for hospital-based wireless devices (if applicable);

(b)  wireless network connection (to support visiting Operator's support staff); and

(c) all necessary technical support to maintain such personal computers and wireless devices in good working order (including providing an IT "help desk" during the CWC Facility's normal business hours).

Operator shall reimburse Hospital for the purchase of the IT Equipment and any replacement equipment during the Initial Term and Extension Term.

**5.5.**   **Information Technology**.

**A.** Hospital's network shall have sufficient bandwidth, as reasonably determined by Hospital and in consultation with Operator, to allow for unimpeded access to Operator's web-based electronic medical records application and supporting software.

**B.** In addition, at its sole cost and expense, Hospital shall provide to Operator:

(a) a secure site-to-site VPN connection in a configuration that is mutually agreed upon by both parties;

(b) an HL7 compliant ADT (Admission Discharge and Transfer) interface to Operator's web-based electronic medical records application which will provide, among other things, HL7 compliant ADT messages for all Patients serviced by Operator and must be tested and in production prior to the First Service Date;

(c) access to a URL from within Hospital's network to Operator's secure web-based electronic medical record application and Operator's secure webmail email system, and Hospital shall take all reasonably necessary steps to ensure that Hospital's firewalls and content filters will not impede access to these systems; and

(d)  standard Internet connectivity to allow secure remote access, as mutually agreed upon, to Staff's computers located at Hospital for the purposes of remote technical support diagnostics related to the Operator's web-based electronic medical record and email applications, and Hospital shall take all reasonably necessary steps to ensure that Hospital's firewalls and content filters shall not impede this secure remote support access.

**C.**  Upon Hospital's request, Hospital may receive an electronic patient post-visit clinical documentation report, using one of the supported formats and interfaces provided by Operator, at Hospital's sole cost and expense.

**D.**  Operator and Hospital agree that within thirty (30) business days of the Effective Date, the Parties shall agree to the information technology requirements set forth in this Section 5.5 and to the terms articulated in <u>Exhibit D</u>, Billing Protocol.  Such agreement will be presented in a Hospital-Operator Work Plan (the "**Work Plan**") that will set forth the procedures, timeframes and each Party's responsibilities to ensure that all necessary information technology and Billing Protocol requirements are in place and operational no less than thirty (30) days prior to the First Service Date.

**5.6.**  **Oxygen**.  At its sole cost and expense, Hospital shall supply the CWC Facility with such oxygen, including liquid oxygen, as may be required for all Treatments provided at the CWC Facility.

**5.7.**  **Compliance Program.**  Although Operator is assisting Hospital in performing certain compliance-related activities set forth in this Agreement, Hospital shall have ultimate control and authority over its compliance program to reduce the potential for fraud and abuse and to ensure compliance with other federal, state and local regulatory requirements impacting Hospital and the CWC Facility.  By entering into this Agreement, Hospital does not delegate to Operator any of the ultimate powers, duties and responsibilities vested in Hospital by Law or by any Accrediting Organization, including but not limited to, Hospital retaining exclusive authority and control over care of Patients, provider credentialing and personnel training activities.

**6.**    **REPRESENTATIONS AND WARRANTIES OF OPERATOR**

Operator hereby represents and warrants to Hospital, as of the date hereof, as follows:

**6.1.**  **Organization**.  Operator is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization. Operator has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license.

**6.2.**  **Authorization**.  Operator has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement; (ii) perform its obligations hereunder; and (iii) consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Operator, and the performance by Operator of its obligations under this Agreement have

been duly authorized by all necessary corporate action on the part of Operator. This Agreement has been duly executed and delivered by Operator and, assuming due authorization, execution and delivery by Hospital, constitutes, or will constitute, a valid and binding agreement of Operator, enforceable against Operator in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law).

**6.3.** **No Conflicts or Approvals**.  The execution, delivery and performance by Operator of this Agreement and the performance by Operator of its obligations under this Agreement do not and will not: (i) violate, conflict with or result in a breach by Operator of its Organizational Documents; (ii) violate, conflict with or result in a breach of, or constitute a default by Operator (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which Operator or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to Operator or any of its properties or assets.

**6.4.** **Proceedings**.  There are no Proceedings pending or, to the knowledge of Operator, threatened against Operator that could reasonably be expected to restrain, delay or inhibit its ability to perform its obligations under this Agreement.  Operator is not subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Operator to perform its obligations under this Agreement.

**6.5.** **Applicable Laws**.  Operator is familiar with all applicable Laws concerning the services to be provided by it hereunder (including, without limitation, all anti-kickback laws and rules and the so-called "Stark" law (42 U.S.C. Section 1395nn, et seq.) and all rules and regulations promulgated thereunder).  Operator acknowledges and agrees that this Agreement is the result of arms length negotiating, that the payments to be made by Hospital to Operator hereunder are consistent with the fair market value of the items and services to be furnished by Operator hereunder, and that no portion of any such payments is intended as an inducement or reward of patient referrals to the CWC Facility or Hospital, or in exchange for other prohibited conduct.

**6.6.** **Licenses, Permits and Certificates**.  Operator represents to Hospital that it and its, employees, agents and representatives possess and will maintain during the term of this Agreement, all licenses, permits and certifications required for the non-medical management and technical operation of the CWC Facility and provision of the CWC Administrative Services.

**6.7.** **Establishing Patient Charges**.  Hospital shall charge Patients for Treatments and related medical services provided at the CWC Facility in accordance with the following rates, which may be revised by Operator annually, (with the consent of the Hospital, which consent will not be unreasonably withheld), in the exercise of its business judgment, in good faith:

    **A.**   HBO Charge C-1300 - $650 per 30-minute segment.

    **B.**   Wound Care charges set at Medicare APC Rates times a multiplier of 3.5.

**7.** **REPRESENTATIONS AND WARRANTIES OF HOSPITAL**

Hospital represents and warrants, as of the date hereof, to Operator, as follows:

**7.1.** **Organization**.  Hospital is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  Hospital has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and will be, on the date that hospital operations commence, duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license.

**7.2.** **Authorization; Enforceability**.   Hospital has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement; (ii) perform its obligations hereunder; and (iii) consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Hospital, and the performance by Hospital of its obligations under this Agreement have been duly authorized by all necessary corporate action on the part of Hospital. This Agreement has been duly executed and delivered by Hospital and, assuming due authorization, execution and delivery by Operator, constitutes, or will constitute, a valid and binding agreement of Hospital, enforceable against Hospital in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law).

**7.3.** **No Conflicts or Approvals**.   The execution, delivery and performance by Hospital of this Agreement and the performance by Hospital of its obligations under this Agreement do not and will not: (i) violate, conflict with or result in a breach by Hospital of its Organizational Documents; (ii) violate, conflict with or result in a breach of, or constitute a default by Hospital (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which Hospital or any of its properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to Hospital or any of its properties or assets.

**7.4.** **Proceedings**.   There are no Proceedings pending or, to the knowledge of Hospital, threatened against Hospital that could reasonably be expected to restrain, delay or inhibit its ability to perform its obligations under this Agreement.  Hospital is not subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Hospital to perform its obligations under this Agreement.

**7.5.** **Suitability of Designated Location**.   The Designated Location will be suitable for the installation and operation of up to four (4) Chambers.

**7.6.** **Applicable Laws**.   Hospital acknowledges and agrees that this Agreement is the result of arms length negotiating, that the payments to be made by Hospital to Operator hereunder are consistent with the fair market value of the items and services to be furnished by Operator hereunder, and that no portion of any such payments is intended as an inducement or reward of patient referrals to the CWC Facility or Hospital, or in exchange for other prohibited conduct.  Hospital further acknowledges and agrees that its policies and procedures are in compliance with applicable federal, state and local law.

**8.** **ADDITIONAL COVENANTS OF OPERATOR**

**8.1.** **Professional Services**.  The Parties hereto acknowledge that Operator is not authorized or qualified to engage in any activity which may be construed or deemed to constitute the practice of medicine or any other clinical field of health care.  Therefore, and notwithstanding any provision or implication to the contrary herein, Operator shall not engage in any such activity which may be construed or deemed to constitute the practice of medicine or any other clinical field of health care, nor shall Operator in any way or manner supervise or determine the methods or standards of the medical care provided by Hospital and Professional Staff, specifically, and without in any manner limiting the foregoing:

**A.** Hospital shall be solely responsible for the care and treatment of its Patients, and with respect thereto, shall at all times be solely responsible for supervising all Professional Staff performing Professional Services under its orders or on its behalf, including any such persons whose services are made available to the CWC Facility under this Agreement;

**B.** Operator shall not determine if or when a Patient shall be admitted for care to the CWC Facility and/or discharged from care by the CWC Facility, and Operator shall in no way determine or set the methods, standards or conduct of the practice of medicine or health care at or by the CWC Facility or any of the Professionals;

C.      All medical records, charts and vital records pertaining to the CWC Facility's active and/or inactive patients shall be and remain the property of and shall be maintained by and under the control of Hospital.

8.2.    **Advertising and Community Education**.  Operator agrees that it shall not engage in any advertising and/or community education of the CWC Facility or Hospital without Hospital's prior written consent, which consent shall not be unreasonably withheld.   Any such advertising and/or community education shall be done in accordance with all Laws and Hospital's policies.  The Parties further agree to the following:

A.      Hospital agrees to provide Operator with the following information for Operator to use to advertise and promote the CWC Facility within fifteen calendar days of the signing of this contract or ninety calendar days prior to the anticipated date of open, whichever  timeframe is shorter:  (i)  Hospital's designated contact authorized to make all advertising and community education decisions, (ii) Hospital's medical staff directory with specialty, office address, phone, fax and email address, (iii) Hospital and/or wound center logos, (iv) Hospital's official PMS color(s) and  branding guidelines, if available, (v) physicians in the health system who treat for chronic inpatient and outpatient wound related procedures and diagnoses, (vi) Hospital's standard departmental meeting list with dates, times and locations and departmental contacts and phone numbers for in-service planning.

B.      Operator and Hospital agree that within sixty (60) days of the signing of this Agreement, and also within sixty (60) days following each anniversary of the First Service Date, the Parties will agree to the particulars of an advertising and community education program (the "**Awareness Program**").   Such agreement will include pre- and post-opening community education and advertising initiatives specific to the CWC prior to and during its initial year of operation.  Items in the Awareness Program may include, but are not limited to (and by way of example), brochures, flyers, handouts and print advertisements for inclusion in various local media, press releases, testimonials, letters from the CWC Medical Director and System chief executive and chief operating officers.  The Parties agree to review the Awareness Program implementation on a regular basis throughout the year, such review dates to be established by the Parties, to determine the results of various initiatives.   This same protocol will be followed for each subsequent year that this Agreement is in effect, including any and all renewal terms of this Agreement.

C.      Each of the Parties agrees that Hospital's maximum annual Awareness Program spending will not exceed $10,000 and that Operator will match Hospital's Awareness Program spending, on a dollar-for-dollar basis, up to $10,000.

8.3.    **Applicable Laws**.  Operator shall provide CWC Administrative Services in accordance with all applicable Laws.

8.4.    **Permits and Approvals**.  Operator shall assist Hospital in ensuring that the CWC Facility has any and all licenses, permits and certifications necessary for its operation.

8.5.    **HBO Treatment Guidelines**.  Operator shall cooperate with Hospital to establish and enforce guidelines to make HBO Treatments available <u>only</u> to preauthorized outpatients; <u>provided</u>, <u>however</u>, that the foregoing shall not obligate Operator to take any action which might subject Operator to liability to any Patient.

8.6.    **Non-Solicitation**.  Operator agrees that during the term of this Agreement and, so long as this Agreement is not terminated by Operator based upon a breach by Hospital, for a period of one (1) year following the expiration or termination of this Agreement, it shall not directly or indirectly (a) solicit, (b) employ (whether as an employee, consultant, independent contractor or otherwise) or (c) otherwise agree to compensate or compensate for services any Person who is, or within one (1) year prior to any such solicitation, employment or agreement, has been, an employee of Hospital, <u>provided</u>, <u>however</u>, if any such Person responds, without any direct solicitation by Operator to a general solicitation advertising

a job opening posted in the public media (such as through an internet job posting site (such as Monster.com), a newspaper, or magazine), the solicitation of such employee shall not constitute a breach of this Section 8.6; provided, further, however, that if any such Person responds to a general solicitation advertising a job opening posted in the public media, Operator may employ or otherwise compensate for services such Person with the consent of Hospital, which consent may not be unreasonably withheld, and such employment or other compensation for services shall not constitute a breach of this Section 8.6. This Section shall survive termination of the Agreement.

**9.**     **ADDITIONAL COVENANTS OF HOSPITAL**

**9.1.**     **Target Date**.  Hospital agrees that it will cooperate with Operator as may be reasonably necessary to facilitate the opening of the CWC Facility by the Target Date.

**9.2.**     **Billing**.  Hospital shall comply with the Billing Protocol, in all material respects. Moreover, Hospital agrees that it will cooperate with Operator as may be reasonably necessary to facilitate the Hospital's expeditious billing of Responsible Parties for Treatments and other services provided at the CWC Facility.  This Section shall survive termination of the Agreement.

**9.3.**     **Health Assessments**.  Hospital agrees that it will provide health assessments as required for Staff pursuant to Section 4.1 hereof at no cost to Operator or Staff.

**9.4.**     **Training Programs**.  Hospital agrees that once it has established Programs relating to the provision of CWC Administrative Services, it shall not alter or modify such Programs without the consent of Operator, which consent will not be unreasonably withheld, unless such alteration or modification is necessary to comply with a change in Law.

**9.5.**     **Operator Property Unencumbered**.  Hospital agrees that it shall not take any action to encumber any CWC Equipment or other property of Operator.

**9.6.**     **Unimpeded Operation of CWC Facility**.  Hospital agrees that it shall not take any action or adopt any policy, other than in accordance with this Agreement that would reasonably be expected to hinder Operator's non-medical management and provision of CWC Administrative Services at the CWC Facility.

**9.7.**     **Permits and Approvals**.  Hospital agrees that it will cooperate and assist Operator in obtaining all necessary permits and approvals related to the operation of the CWC Facility, it being understood that obtaining such permits and approvals is Hospital's ultimate responsibility.  Hospital shall operate the CWC Facility in compliance with applicable law and requirements of applicable Accrediting Organizations, including Laws governing Hospital's participation in the federal health care programs.

**9.8.**     **HBO Treatment Guidelines**.  Hospital shall cooperate with Operator to establish and enforce guidelines to make HBO Treatments available only to preauthorized outpatients.

**9.9.**     **Non-Solicitation**.  Hospital agrees that during the term of this Agreement and, so long as this Agreement is not terminated by Hospital based upon a breach by Operator, for a period of one (1) year following the expiration or termination of this Agreement, it shall not directly or indirectly (a) solicit, (b) employ (whether as an employee, consultant, independent contractor or otherwise) or (c) otherwise agree to compensate or compensate for services any Person who (i) is, or within one (1) year prior to any such solicitation, employment or agreement, has been, an employee of Operator or (ii) is, or within one (1) year prior to any such solicitation, employment or agreement, has been, a member of the Staff provided by Operator pursuant to Section 4.1 hereof; provided, however, if any such Person responds, without any direct solicitation by Hospital to a general solicitation advertising a job opening posted in the public media (such as through an internet job posting site (such as Monster.com), a newspaper, or magazine), the solicitation of such employee shall not constitute a breach of this Section 9.9; provided, further, however, that if any such Person responds to a general solicitation advertising a job opening posted in the public media, Hospital may employ or otherwise compensate for services such Person with the consent of Operator, which consent shall not be unreasonably withheld, and such employment or

other compensation for services shall not constitute a breach of this Section 9.9.  This Section shall survive termination of the Agreement.

     **9.10.**   **Directory & Signage**.  Hospital shall include the CWC Facility in its directory and on signage inside and outside of the CWC Facility.

## 10.    TERM AND TERMINATION

     **10.1.**   **Term**.  Unless terminated earlier as provided in Sections 10.2 or 10.3 of this Agreement, this Agreement shall be for an initial term of five (5) years from the First Service Date (the "**Initial Term**"). This Agreement shall be in effect from the date of its execution, but the Initial Term shall not commence until the date the CWC Facility opens to receive Patients and the first Treatment is performed.  The parties may extend this Agreement for two consecutive three (3) year terms (each, an "**Extension Term**") upon the written approval of authorized representatives of the parties.

     **10.2.**   **Termination by Either Party in the Absence of Breach**.  Either Party shall have the right to terminate this Agreement upon thirty (30) days' prior written notice, in the event that reimbursement rules or regulations change and result in a material (at least fifty (50%) percent) negative modification in the aggregate of both Wound Care Treatments and HBO Treatments collections for Treatments provided at the CWC Facility.

     **10.3.**   **Termination for Cause**.  This Agreement may be terminated pursuant to either of the following provisions:

          **A.**    By either Party upon the other Party's material breach of any obligations hereunder, if such breach remains uncorrected for a period of thirty (30) days after the receipt by the breaching Party from the other Party of written notice of such default or breach, which notice sets forth in detail the nature of such breach; or

          **B.**    By either Party immediately upon notice that the other Party has filed a petition in bankruptcy, or made an assignment for the benefit of creditors, or is otherwise unable to meet its financial obligations under this Agreement, unless otherwise agreed in writing by both Parties or unless said bankruptcy, assignment or inability does not materially alter the affected Party's ability to perform under this Agreement.

     **10.4.**   **Effect of Termination**.  Upon expiration or termination of this Agreement, such expiration or termination shall not affect any of the obligations of either Party arising prior to the date of such expiration or termination, nor shall such expiration or termination affect any obligations, promises or covenants contained herein which are expressly made to extend beyond the Term of this Agreement. Any such termination shall not prejudice Operator's rights to collect from Hospital any and all amounts due Operator for services rendered prior to the date of such termination.

     **10.5.**   **Removal of Property**.  Upon termination of this Agreement, Operator, at its sole cost and expense, shall promptly remove all of its property from the CWC Facility, including the CWC Equipment. Operator shall restore the Designated Location to the condition in which it existed prior to Operator's installation of the CWC Equipment, wear and tear excepted.  This Section shall survive the termination or expiration of this Agreement.

## 11.    CONFIDENTIALITY

     **11.1.**   **Patient Records**.  Operator shall comply with Hospital's policies, all Laws and Accrediting Organizations' requirements regarding the confidentiality, disclosure and retention of patient records.  Medical records of Hospital's patients are and shall remain the property of Hospital and shall not be faxed, copied or removed from Hospital's storage areas without the express written consent of Hospital, unless otherwise directed by court order; provided, however, that Operator shall be permitted to copy Hospital's Patient records as Operator deems necessary in the performance of its obligations under this Agreement.  Operator hereby acknowledges and agrees that its electronic medical records system

shall include a central server that is housed in a secure facility with continuous backup capability and that all data transmitted between the CWC Facility and the central server shall be fully encrypted and shall comply with all applicable laws governing privacy of medical records.

**11.2.** **Confidential Information**.  Each Party hereto agrees and acknowledges that the other Party possesses books, manuals, documents, materials, or other business information or patient related information which were distributed or otherwise disclosed to the other Party or its employees, agents or representatives, or developed pursuant to the operation of their respective businesses to which such other Party or its employees, agents or representatives had access as a result of the operation of such Party's business and which are not in the public domain; such books, manuals, documents, materials, etc. shall constitute confidential information under this Agreement ("**Confidential Information**").  Such Confidential Information shall include this Agreement (including drafts thereof), technical and business information, including but not limited to information related to invention, brochures, forms, customer lists, research and development, engineering, products, designs, manufacture, methods, systems, improvements, trade secrets, formulas, process, protocols, records and financial information, or strategy concerning its business plan or policies or patient or provider related information.  Each Party, and its employees, agents and representatives shall not use any of the other Party's Confidential Information for any purpose otherwise than in connection with the performance of its obligations under this Agreement, and shall not disclose, publicize or disseminate any such Confidential Information to any third party without the express written consent of the other Party, except as may be required under applicable Laws. In the event applicable Laws require a Party to disclose such Confidential Information of the other Party; such Party shall immediately notify the other Party whose Confidential Information is in question of the request for disclosure, and to the extent permissible by Laws, such other Party shall respond to said request. Upon termination of this Agreement, each Party shall use its best efforts to retrieve from its respective employees, agents and representatives and return to the other Party any and all materials containing Confidential Information of the other Party.  Confidential information shall not include information which: was, is or becomes known to a Party from a third party through no fault of the Party; is learned by a Party from a third party legally entitled to disclose such information; or is required to be disclosed to a third party under applicable law.  The Parties agree that disclosure of a Party's Confidential Information other than in accordance with this Section shall cause irreparable injury to such Party, and that the injured party shall be entitled to injunctive relief and may be entitled to compensatory or other damages or relief in the event of disclosure of Confidential Information.

**11.3.** **Use of Name**.  Neither Hospital nor Operator shall use in any manner the name, logo, trade name or trademark of the other Party hereto, without the express prior written consent of the other Party.

**11.4.** **HIPAA Business Associate**.  The Parties agree to be bound by the terms, conditions and warranties concerning confidential patient information contained in Exhibit E.

**11.5.** **Survival**.  Each of the Sections of Article 11 shall survive the termination or expiration of this Agreement.

## 12. INSURANCE, INDEMNITY & LIMITATION OF LIABILITY

**12.1.** **Liability and Workers Compensation Insurance**.  Each Party shall, at its sole cost and expense, maintain comprehensive general liability and professional liability insurance with one or more commercial insurers reasonably satisfactory to the other Party in the amount of at least One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) in the aggregate.

**12.2.** **Proof of Insurance**.  Upon execution of this Agreement, each Party shall deliver to the other copies of certificates of insurance reflecting each type of insurance required under Section 12.1 hereof. Each Party agrees to notify the other Party within five (5) Business days of any material change in or cancellation of any policy of insurance required to be incurred or maintained by such Party hereunder. Each Party shall be obligated to furnish renewal certificates of insurance to the other.

**12.3.** <u>**Indemnity**</u>. Each Party reserves its common law rights of indemnification and reimbursement for any legal wrongs, errors or omissions by the other Party that may result in liability to the other. Without limiting the foregoing:

      **A.** Operator shall indemnify and hold Hospital and its officers, directors, trustees, employees, agents and/or representatives, and the successors and assigns of each of the foregoing, harmless from and against any losses, costs, claims, liabilities and expenses, including reasonable attorney fees ("**Losses**") that may be suffered by Hospital arising out of the gross negligence or willful misconduct of Operator, or any other of Operator's employees, independent contractors, agents or representatives, or out of any material breach by Operator of this Agreement.

      **B.** Hospital shall indemnify and hold Operator and its officers, directors, employees, agents and/or representatives, and the successors and assigns of each of the foregoing, harmless from and against any Losses that may be suffered by Operator arising out of (i) the gross negligence or willful misconduct of Hospital or any of Hospital's employees, independent contractors, agents or representatives, (ii) any material breach by Hospital of this Agreement or (iii) any Proceeding, whether undertaken by a Governmental Authority or any agent thereof, or any action taken by a third party payor, in each case against either the Hospital or Operator (including without limitation, information requests, audits or requests for reimbursement or recoupment of other payments), in connection with (A) the submittal of claims for Treatment(s) at the CWC Facility for services provided during the Initial Term or any Extension Term or (B) the compliance of the CWC Facility or the Hospital with applicable Laws or the requirements of applicable Accrediting Organizations during the Initial Term or any Extension Term, so long as such Proceeding or action does not arise as a result of Operator's breach of this Agreement.

      **C.** Following indemnification as provided for hereunder, the party providing hereunder (the "**Indemnifying Party**") shall be subrogated to all rights of the party receiving indemnification hereunder (the "Indemnified Party") with respect to all entities or persons relating to the matter for which indemnification has been made; provided, however, that the Indemnifying Party shall have no subrogation right to seek reimbursement through or from the Indemnified Party's insurance policies, program, coverage, carriers or beneficiaries. All indemnification obligations set forth in this Section 12.3 shall survive the expiration or termination of this Agreement.

    **12.4** <u>**Limitation on Liability.**</u> Neither party is liable to the other, even if advised of the possibility, for any of the following: (i) indirect, consequential or punitive loss, damage, cost, or expense of any nature; (ii) loss of business, profits, or revenue; (iii) loss of goodwill or anticipated savings; (iv) loss of or corruption to data; or (v) loss of operation time or loss of contracts.

**13.** <u>**MISCELLANEOUS**</u>

    **13.1.** <u>**Hospital Policies and Practices**</u>. Operator agrees to abide by Hospital policies and practices including participating in quality assurance/quality improvement activities, safety rules, infection control rules, verification of licenses.

    **13.2.** <u>**Availability of Documents**</u>. To the extent the 1980 Omnibus Reconciliation Act (Public Law 96-499) is applicable to Operator's provision of CWC Administrative Services hereunder, Operator agrees that until the expiration of four (4) years after the furnishing of services under this Agreement, Operator shall make available upon written request of the Secretary of Health and Human Services, or upon request of the Comptroller General of the United States or any of their duly authorized representatives, copies of this contract, books, documents and records of Operator that are necessary to certify the nature and extent of the costs hereunder. If Operator carries out any of the duties of this Agreement through a subcontract having a value or cost of $10,000 or more over a twelve (12) month period, such subcontract shall contain a clause to the effect that, until the expiration of four (4) years after their furnishing of such services pursuant to such subcontract, the subcontractor shall make available upon written request of the Secretary of Health and Human Services or upon request of the Inspector

General of the United States, or any of their duly authorized representatives, copies of the subcontract and books, documents, and records of the subcontractor that are necessary to verify the nature and extent of the costs of such subcontract.  Notwithstanding any provision herein to the contrary, Operator shall not have any of its duties and obligation hereunder carried out by any subcontractor without the prior written consent of Hospital, which consent may be withheld at Hospital's sole discretion.  This Section shall survive the termination or expiration of this Agreement.

     **13.3.**   **Independent Contractor**.  It is understood and agreed that each Party, together with its respective agents, servants and employees, is at all times acting as an independent contractor, and that neither has any express or implied authority to assume or create any obligation or responsibility on behalf of or in the name of the other Party, unless expressly stated herein.

     **13.4.**   **Assignment**.  This Agreement shall not be assigned by either Party without the written consent of the other Party, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, Hospital's consent shall not be necessary for the assignment of this Agreement by Operator to a wholly-owned Affiliate of Operator.

     **13.5.**   **Construction**.  This Agreement shall be construed and enforced under the laws of the State of New Jersey, without regard to conflict of laws.

     **13.6.**   **Notices**.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) if hand delivered or (ii) if mailed, three (3) days after mailing, by United States certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses (or at such other address as shall be given in writing by either Party to the other):

     **To Operator:**

     RESTORIX HEALTH, INC.
     445 Hamilton Avenue, Suite 800
     White Plains, NY 10601
     Attn: David Walz, President
     By Fax: 914-372-3151

     **To Hospital:**

     SALEM COUNTY HOSPITAL CORPORATION
     D/B/A SALEM MEDICAL CENTER
     310 Woodstown Road
     Salem, NJ  08079
     Attn: Ellsworth Havens, CHA Partners
     By Fax:

     **13.7.**   **Compliance with Law**.  Notwithstanding any other provision of this Agreement, Hospital remains responsible for ensuring that any medical service provided at the CWC Facility pursuant to this Agreement complies with applicable Laws and requirements of applicable Accrediting Organizations.

     **13.8.**   **Amendment; Modification**.  This Agreement may be modified or amended by mutual consent of the Parties. Any such modification or amendment must be in writing, duly executed by authorized representatives of both Parties.

     **13.9.**   **Attorneys' Fees**.  Each Party hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees, whether or not the transactions contemplated hereby are consummated; provided, however, in the event of any action relating to the termination of this Agreement, including, but not limited to, mediation, arbitration or litigation, the Party that prevails in such action shall be entitled to receive reimbursement from the other Party of its costs and expenses incurred in prosecuting or defending such action.

13.10.  **Severability**.  If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

13.11.  **Entire Agreement**.  This Agreement supersedes all previous contracts and constitutes the entire Agreement between the Parties concerning the subject matter hereof. No oral statements or prior written material not specifically incorporated herein shall be of any force and effect and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein.

13.12.  **Parties in Interest**.  Except as expressly provided herein, there are no third party beneficiaries of this Agreement.

13.13.  **Headings**.  The headings preceding the text of sections of this Agreement and the exhibits hereto are for convenience only and shall not be deemed part of this Agreement.

13.14.  **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement.  The delivery of an executed counterpart of this Agreement by facsimile or pdf shall be deemed to be valid delivery thereof.  It shall be sufficient in making proof of this Agreement to produce or account for a facsimile or pdf copy of an executed counterpart of this Agreement.

[Signature Page to Follow]

**IN WITNESS WHEREOF**, this Agreement has been executed by the duly appointed representative of the named corporations as of the Effective Date.

**OPERATOR:**

**RESTORIX HEALTH, INC.**

By:_____

Name:   David J. Walz

Title:     President


**HOSPITAL:**

**SALEM COUNTY HOSPITAL CORPORATION**

By:_____

Name:   Tammy Torres

Title:     Chief Executive Officer

**EXHIBIT A**

**DESIGNATED LOCATION**


**[TO BE DETERMINED]**

**EXHIBIT B**

**HBO EQUIPMENT**



**Sigma 34 Hyperbaric Chamber System Technical Specifications**

**Dimensions**

| | |
|---|---|
| Width | 40 inches (101.6 cm) |
| Length | 105 inches (266.7 cm) |
| Height | 61 inches (154.9 cm) |
| Internal Diameter | 33.5 inches (85.1 cm) |
| Internal Length | 90 inches (228.6 cm) |
| Internal Volume | 47.2 cubic feet (1.34 cubic meters) |
| Weight | 2,200 lb. (998 kg) |

**Performance**

| | |
|---|---|
| Maximum Operating Pres | 30 psi/3 ATA (2.07 bar) |
| Design Temperature Range | 32-100 Deg.F (0-38 Deg. C) |
| Medical Gas Supply | 50-90 psi @ 30 scfm (3.4-6.2 bar @ 850 lpm) |
| Ventilation Rate | (4.4-13.6 scfm) 125-385 lpm |
| Pressure Change Rate | 1-5 psi/min (0.07-.34 bar/min) |
| Emergency Depressurization Rate | 3 ATA to 1 ATA in 100 seconds - Approximate rate |

**EXHIBIT C**

**SERVICES FEE**

Effective as of the first date on which a Wound Care Treatment is administered in the CWC Facility, Hospital shall pay Operator a Service Fee as reflected in the below fee structure.

| <u>TREATMENT DESCRIPTION</u> | <u>Percent Fee</u> |
|---|---|
| Wound Care Treatment | For each Wound Care Treatment administered at the CWC Facility, Hospital shall pay Operator a Service Fee equal to 70% of all amounts collected by Hospital from all Responsible Parties (including from Patient, primary insurance and secondary insurance) on account of such Wound Care Treatment. |

Effective as of the first date on which a HBO Treatment is administered in the CWC Facility, Operator's fee for each Wound Care Treatment shall reduce and Hospital shall pay Operator a Service Fee as reflected in the below fee structure.

| <u>TREATMENT DESCRIPTION</u> | <u>Percent Fee</u> |
|---|---|
| HBO Treatment | For each HBO Treatment administered at the CWC Facility, Hospital shall pay Operator a Service Fee equal to 65% per HBO Treatment of all amounts collected by Hospital from all Responsible Parties (including from Patient, primary insurance and secondary insurance) on account of such HBO Treatment. |
| Wound Care Treatment | For each Wound Care Treatment administered at the CWC Facility, Hospital shall pay Operator a Service Fee equal to 65% of all amounts collected by Hospital from all Responsible Parties (including from Patient, primary insurance and secondary insurance) on account of such Wound Care Treatment. |

**EXHIBIT D**

**BILLING PROTOCOL**

1.  Hospital shall establish two separate service codes for (a) Wound Care Treatments and (b) HBO Treatments on the Chargemaster report to help ensure patient identification and payment posting.

2.  With the exception of Medicare, which may or may not have to be billed at end of month, Hospital shall bill Treatments on a daily basis.

3.  Any patient registration/billing system edits should be sent to Operator's revenue cycle manager/representative either via email or through a dedicated work queue in Hospital's registration/billing system.

4.  Hospital shall provide Operator with remote access to view the Hospital's aged trial balance and all transactions related to HBO and Wound Care Treatment billing, including, but not limited to, demographic screens, invoices, billing notes, clinical notes, insurance eligibility, and other data necessary to confirm patient billing information, etc., pursuant to Section 4.10.

5.  Hospital shall electronically provide to Operator an Aged Trial Balance Report containing the following: a monthly aged trial balance within five (5) calendar days of the close of the month which shall include patient name, dates of service, insurance coverage, and aging balances.

6.  ADR Notification: Hospital shall notify Operator of any ADRs regarding HBO Treatments or Wound Care Treatments within five (5) days of its receipt by Hospital, notification to provided electronically.  All responses will be prepared by Operator upon Hospital's request.

7.  At its sole cost and expense, Hospital shall provide Operator with remote access via a secure mechanism to Hospital's patient billing system for billing payment inquiry purposes, provided, however, that nothing herein contained shall, in any way, grant, or be construed to give, to Operator the right to change or otherwise revise any of the data maintained by Hospital in its billing system.

**EXHIBIT E**

**HIPAA BUSINESS ASSOCIATE**

**[TO BE PROVIDED BY HOSPITAL]**

**SCHEDULE 4.1**

**INITIAL STAFF**

**INITIAL STAFF PROVIDED BY RESTORIXHEALTH**

| Staff | FTE |
|---|---|
| Program Director, RN | 1.0 |
| Wound Care Nurse, RN | 2.12 |
| HBO Tech/LPN | 1.06 |
| Front Desk Person | 1.06 |
| **Total FTE** | **5.24** |

Medical Director Stipend (Independent Contractor):  $24,000/year